UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE OCEAN CONSERVANCY and OCEANA, INC., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| CARLOS M. GUTIERREZ,[1] Secretary, United States Department of Commerce, NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION and NATIONAL MARINE FISHERIES SERVICE, | ) ) ) Civ. Action No. 04-1155 (RJL) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| BLUE WATER FISHERMEN'S ASSOCIATION, | ) ) ) |
| Intervenor-Defendant. | ) |

**MEMORANDUM OPINION**
(October ___, 2005) [# 33, 44, 46, 48]

This action for declaratory relief, brought by The Ocean Conservancy and Oceana, Inc., two non-profit environmental organizations, (collectively "plaintiffs"), challenges three decisions of the National Marine Fisheries Service ("NMFS" or "federal defendant"), a federal agency under the purview of the National Oceanic and Atmospheric Administration, relating to the treatment of sea turtles under a Fishery

---

[1]    Secretary Gutierrez has been substituted as a party in place of former Secretary Donald L. Evans. *See* FED. R. CIV. P. 25(d).

Management Plan ("FMP") for the Atlantic Highly Migratory Species Pelagic Longline Fishery ("HMS-PLL Fishery" or "Atlantic Fishery").  Plaintiffs specifically contend that: (1) the NMFS's July 6, 2004 Final Rule ("2004 Final Rule") creating new regulations governing the HMS-PLL Fishery fails to comply with the substantive requirements established by the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "MSA"), 16 U.S.C. §§ 1801, *et seq.*; (2) the NMFS's June 1, 2004 Biological Opinion ("2004 BiOp") violates provisions of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531, *et seq.*; and (3) the NMFS's June 22, 2004 final Supplemental Environmental Impact Statement ("final SEIS") fails to follow the mandate set forth by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332.[2] Presently before the Court are cross-motions for summary judgment. *See* Dkt. ## 44, 46, 48.  The Court, having considered the voluminous administrative record, the parties' pleadings, and the arguments of counsel at the September 14, 2005 hearing, GRANTS the federal defendants' motion for summary judgment.[3]

---

[2]        Plaintiffs filed a motion for leave to file their first amended complaint on October 7, 2004, nearly three months after filing the initial complaint.  The first amended complaint seeks, among other things, to add a new cause of action against the defendants for violations of section 7 and 9 of the ESA. Pl.'s Mot. For Leave to File Amended Compl. ("Mot. To Amend") at 1.  Defendants oppose plaintiffs' motion, arguing that they will suffer undue prejudice if leave is granted, and that the merits of the amendment are nevertheless futile. Def.'s Opp'n to Pl.'s Mot. To Amend at 2 (citing FED. R. CIV. P. 15(a)).  To support their position, defendants point out that the plaintiffs filed their motion to amend after the defendants filed their answer to the initial complaint and nearly *two months after* the Court denied plaintiffs' motion for a preliminary injunction. *Id.* at 2-3.  Although the Court recognizes that leave to amend "shall be freely given," justice does not require the purported amendment in this case.  To the contrary, as defendants aptly observe, plaintiffs' failure to file their motion for leave sooner amounts to "undue delay" under the circumstances.  Moreover, the Court also notes the futility of the plaintiffs' amendment.  Thus, after due consideration of the plaintiffs' motion for leave to amend [#33], the allegations of the first amended complaint, the defendant's opposition, the relevant law, and the entire record herein, plaintiffs' motion is DENIED.  This Memorandum Opinion, therefore, only addresses the claims raised in plaintiffs' initial complaint.

[3]        Blue Water Fishermen's Association ("BWFA" or "Intervenor-Defendants") has intervened, moved for summary judgment on its own behalf, and opposed plaintiffs' motion for summary judgment.  Though this Memorandum Opinion focuses on the federal defendant's motion, it addresses the arguments and relief sought in intervenor's motion because they essentially seek the same relief.  Accordingly, intervenor's motion is denied as

## BACKGROUND

The Atlantic Fishery is a deep sea fishery that extends from the Gulf of Mexico to the edge of the continental shelf, off the east coast of Newfoundland. AR Vol. 2, Doc. I-11 at 3-15.[4] As its name implies, the Atlantic Fishery targets various "highly migratory species" of fish using a pelagic longline fishing technique. *Id.* "Highly migratory species," as defined by the Magnuson-Stevens Act, includes several types of tuna, swordfish, marlin, and oceanic sharks. 16 U.S.C. § 1802(20). "Pelagic longline fishing" is a commercial fishing method that involves deploying lines up to several miles long, supported by floats. Fed. Def.'s Stmt. of Facts at 3. Hooks baited with mackerel or squid are attached to these lines and hung at precise depths depending on the targeted catch.

Pelagic longline fishing has proven to be an extremely effective method for harvesting certain types of fish, but it is also common in the course of long lining for untargeted species, or "bycatch," to get caught in the line trailing behind vessels, or even to hook themselves.[5] Bycatch is of particular concern when, as here, it consists of species protected under the ESA, like loggerhead and leatherback sea turtles, which are prevalent throughout the Atlantic Fishery.[6]

moot.

[4]        Herein, "AR" refers to the Administrative Record.

[5]        The NMFS officially defines "bycatch" as "fish [and sea mammals] that are harvested in a fishery, but that are not sold or kept for personal use." 50 C.F.R. § 600.350.

[6]        The leatherback sea turtle was listed as "endangered" on June 2, 1970. The loggerhead sea turtle was listed as "threatened" on July 28, 1978. Fed. Def. Concise Stmt. of Facts at 3. Although the distinction has ecological significance, legally both classifications are afforded essentially identical protections. Accordingly, for the sake of simplicity, both groups will be referred to as "protected" or "listed" in this Memorandum Opinion.

Although the severity of interactions between the protected sea turtles and long liners vary from the relatively minor "foul hooking" of a sea turtle's flipper, to a fatal hook swallowing, since at least 1999 experts at the NMFS have concluded that the Atlantic Fishery poses a threat to the survival of leatherback and loggerhead sea turtles. Fed. Def.'s Concise Stmt. of Facts at 3-4. Indeed, since 1999, three BiOps have been issued addressing the HMS pelagic long line fishery. AR Vol. 1, Doc. I-7 at 6622 (citing April 23, 1999 BiOp; June 30, 2000 BiOp; June 14, 2001 BiOp).

The June 14, 2001 BiOp ("2001 BiOp") helps illustrate the evolution of the present controversy. *See* AR Vol. 2, Doc. I-11. The 2001 BiOp concluded that continued operation of the Atlantic Fishery was likely to jeopardize survival of the leatherback and loggerhead sea turtles. Fed. Def.'s Stmt. of Facts at 4. The 2001 BiOp, however, included a Reasonable and Prudent Alternative ("RPA") requiring, among other things, an immediate and indefinite closure of the Northeast Distant ("NED") section of the fishery, and approving an intensive research experiment ("Northeast Distant experiment"). The Northeast Distant experiment was charged with reducing sea turtle bycatch by developing, or modifying, fishing gear and techniques, as well as with evaluating safe-handling techniques to reduce post-release sea turtle mortality. AR Vol. 1, Doc. I-11 at I; AR Vol. 1, Doc. 1010 at 1-4. The 2001 BiOp also included an Incidental Take Statement ("ITS") that authorized the otherwise prohibited "take" of 438 leatherback and 402 loggerhead sea turtles annually.[7] *Id.* If these incidental take levels

---

[7] "Taking" is defined under the ESA as causing the "harassment, injury, or death" of a protected species. An ITS, therefore, permits the action agency to "take" a specific number of protected species without penalty. If, however, the action agency exceeds the limits defined by the ITS, the original statutory prohibitions of

were exceeded, the BiOp required re-initiation of consultation, and a review of the RPA.

AR Vol. 1, Doc. I-7. Although the 2001 BiOp closed the Northeast Distant section of the

Atlantic Fishery, this was widely believed to be only a temporary measure that would

remain only until the prescribed scientific study was complete and its findings adopted

through the formal rulemaking process. Fed. Def's Mot. for Sum. Judg. at 4.

Between 2001 and 2003, the NMFS compiled and analyzed the data received from

the Northeast Distant experiment, along with other scientific information relevant to

bycatch of sea turtles in pelagic longline fisheries.  AR Vol. 1, Doc. I-7 at 6622.

Although no single solution emerged, NMFS experts interpreting the data from the

experiment concluded that certain changes to hook and bait combinations in the fishery's

regulation would substantially improve fishery conservation.  More precisely, results from

the experiment indicated that loggerhead and leatherback sea turtle interactions could be

significantly reduced by replacing the industry-wide standard J-hook with 18/0 circle

hooks.[8] *Id.* at 6623; AR Vol. 1, Doc. I-10 at 4-21 (data showing a sea turtle bycatch

reduction rate of between 50% and 90.4% depending on the type of hook, bait, and turtle

---

the ESA apply.

[8]     The Northeast Distant experiment and other international experiments essentially compared three types of hooks commonly used in pelagic longline fishing.  The first hook, known as a J-hook, is a standard fishing hook designed with the barb roughly parallel to the shaft.  The J-hook used in the Northeast Distant experiment and most other studies is known precisely as a 9/0 (pronounced "nine-aught") J-hook to indicate its relative size (the smaller the number, the smaller the hook).  J-hooks were the dominant hook type in the Atlantic Fishery at the time of the 2001 BiOp, therefore, they served as the control group in the Northeast Distant experiment.  The second hook, known as an 18/0 circle, has a barb turned toward the shaft making a partial circle.  The third hook, known as a 16/0 circle, is like the 18/0 circle, but slightly smaller in overall size.

involved).[9] The research also indicated, however, that this same combination of hook and bait could negatively affect desirable catch, like bigeye tuna. *Id.*

Findings from the Northeast Distant experiment were supported by international research efforts. A study conducted in the Azores in 2002 concluded that compared to J-hooks, the 16/0 circle hook had an excellent potential to reduce sea turtle bycatch and overall mortality. AR Vol. 8, Doc. II-A-20 at 3. Similarly, a study conducted in Nova Scotia, where 16/0 circle hooks were more commonly used than in the U.S. fishery, found that J-hooks increased the capture of leatherback sea turtles when compared to circle hooks. AR Vol. 9, Doc. II-A-23 at 9. Although the NMFS did not have substantial data comparing the relative effectiveness of circle hooks of different sizes, NMFS experts inferred from the information available that the primary benefit of the circle hook over the traditional J-hook with regards to reducing bycatch derived from its shape more than its size. AR Vol. 13, Doc. II-A-54, at 1-2.

After the Northeast Distant experiment had concluded, the NMFS published a notice of intent to prepare a supplemental environmental impact statement ("SEIS") reassessing the potential affects of the Atlantic HMS-PLL on the environment. AR Vol. 2, Doc. I-11 at I. Among the comments received during the public comment period were

---

[9] Scientists involved with the Northeast Distant study noted that because the smaller sized J-hooks were much more likely to be accidentally swallowed by sea turtles, as opposed to foul hooking, interactions with J-hooks tended to lead to a significantly higher mortality rate. By comparison, because the circle hooks were larger, it was more difficult for turtles to swallow them, therefore, the mortality rate for interactions using circle hooks was generally lower. In addition, circle hooks, by virtue of their curved design, make foul hooking less probable, thereby reducing the overall number of interactions. Accordingly, experts from the NMFS concluded generally that when compared to J-hooks, circle hooks had the dual benefit of producing both fewer and less serious sea turtle interactions.

suggestions from the commercial fishing industry that the NMFS hold regional workshops for fishermen on methods for safely removing gear from captured turtles.[10] AR Vol. 2, Doc. I-11 at 1-4.

On February 11, 2004, the NMFS released a draft of its revised FMP for the Atlantic Fishery in the form of a proposed rule and draft SEIS. AR Vol. 1, Doc. I-7; Vol. 2, Doc. I-12 at 2. Together, the proposed rule and the draft SEIS summarized the available research in the Northeast Distant experiment and outlined several alternatives that could potentially reduce bycatch while also minimizing, to the extent practicable, the economic impact on individual fishermen in the fishery. AR Vol. 1, Doc. I-8 at 1-5. The NMFS considered numerous alternatives for achieving these objectives, including modifications to hook and bait requirements, time and area closures, and new rules requiring the use of sea turtle handling and release gear. *Id.* at 2-1 to 2-6. In the draft SEIS, the NMFS indicated a preference for an alternative that would require use of the larger 18/0 circle hooks throughout the entire Atlantic Fishery. AR Vol. 1, Doc. I-7 at 6625; Doc. I-8 at 2-1 to 2-6.

As undoubtedly expected, many formal responses were recorded during the public-comment period from members of the fishing industry. Two concerns, in particular, were frequently expressed: (1) that requiring the larger 18/0 circle hook would reduce the catch of desirable species to unprofitable levels, thereby rendering the fishery non-viable; and (2) that the strict requirements would not be "exportable" to fishermen from other nations

---

[10] The NMFS hosted a workshop with industry representatives and other interested parties to present the preliminary results of the Northeast Distant experiment. AR Vol. 1, Doc. I-10 at 1-5.

who, in fact, represented a majority of participants in the fishery.[11] AR Vol. 2, Doc. I-11 at 4-13.  Other responses, including those from many environmental groups, commended the proposal as moving in the right direction and advocated its timely adoption.  AR Vol. 2, Doc. I-11 at C1-24.

On April 20, 2004, the NMFS asked its own Southeast Regional Office ("SERO") to prepare a Biological Opinion ("2004 BiOp") assessing the effects of reopening the Northeast Distant segment of the fishery subject to an 18/0 circle hook restriction, while imposing a general 16/0 circle hook restriction for the remainder of the Atlantic HMS-PLL, which was contrary to the proposed rule and draft SEIS.[12] AR Vol. 1, Doc. I-9 at 1-2.  NMFS was considering revising its actions in the Final Rule from those described in the proposed rule based upon the public comments received during the comment period, as well as new information regarding sea turtle mortalities and a "reexamination of data pertaining to reductions in bycatch and bycatch mortality associated with various hook and bait combinations."  AR Vol. 1, Doc. I-10 at 1-6.

On June 1, 2004, SERO completed its analysis and issued the 2004 BiOp.  AR Vol. 1, Doc. I-10.  The 2004 BiOp, one of the primary documents challenged by the

---

[11]      Despite the fact that much of the Atlantic Fishery exists either adjacent to or in close proximity to the U.S. mainland, the U.S. fleet represents only a small fraction of the total activity in the fishery.  Because regulations imposed by the NMFS are not binding on international vessels operating on the high seas, special emphasis is given in the NMFS rulemaking process to producing rules that are "exportable" or likely to be adopted by other nations.

[12]      The NMFS functions in dual capacities in this case: First, as the *action* agency, because it enacted the FMP for the Atlantic Fishery pursuant to the Magnuson-Stevens Act. Second, as the *expert* agency, because it assessed the impact of the FMP on leatherback and loggerhead sea turtles pursuant to section 7 of the ESA. More precisely, the Highly Migratory Species Management Division ("HMS Division") of the NMFS's Office of Sustainable Fishery ("OSF") is the action agency and the NMFS's Southeast Regional Office ("SERO") is the expert, or consulting, agency. AR Vol. I, Doc. I-10 at ii. This Memorandum Opinion will refer to the action and expert agencies collectively as "NMFS" except where differentiation is necessary.

plaintiffs in this case, made two particularly relevant findings. First, it concluded that continued operation of the longline fishery would *not* jeopardize the continued existence of the *loggerhead* sea turtle. AR Vol. 1, Doc. I-10 at 7-1. Second, it found that the conservation rule *would* jeopardize the continued existence of the *leatherback* sea turtle. *Id.* The 2004 BiOp, however, went on to identify RPAs necessary to avoid jeopardizing the leatherback turtle while allowing the new conservation rule to take effect.[13] On June 22, 2004, the NMFS released a final SEIS, *see* AR Vol. 2, Doc. 1-11, followed, on July 6, 2004, by a Final Rule adopting the RPAs proposed in the 2004 BiOp, AR Vol. 2, Doc. 1-12. The Final Rule removed all J-shaped "J-hooks" from the fishery, required the larger 18/0 gauge circle-shaped hooks in the NED, and required 16/0, or larger circle hooks, elsewhere in the fishery. AR Vol. 2, Doc. I-14 at 40743.

## LEGAL STANDARDS

### I. Standard of Review

Summary judgment is appropriate when the pleadings and the record demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In this case, where cross-motions for summary judgment are at issue, the Court draws all reasonable inferences regarding the

---

[13] The 2004 BiOp RPA had four components. First, it called for a reduction in the post-release mortality of leatherbacks by requiring better use of hook removal gear of vessels operating in the fishery. Second, it called for increased coverage by official observers to ensure that fishermen are complying with rules governing hook requirements and gear removal techniques. Third, the 2004 BiOp RPA called for validating the choice of the 16/0 circle hook over the 18/0 circle hook through continued research and analysis of catch and Bycatch data. Last, the 2004 BiOp RPA called for specific monitoring of leatherback mortality levels. AR Vol. 1, Doc. I-10 at 8-1.

assertions made in a light favorable to the non-moving party. *Flynn v. Dick Corp.*, 2005 WL 1904018, *2 (July 29, 2005 D.D.C.). The Court will "grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed."[14] *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 2005 WL 1773851, *2 (July 28, 2005 D.D.C.).

## II.     Standard of Review for Agency Actions Pursuant to MSA, ESA, and NEPA

NMFS's actions are reviewed by this Court in accordance with the judicial review provisions of the Administrative Procedure Act. *NRDC v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000); *Gerber v. Norton*, 294 F.3d 173, 178 n. 4 (D.C. Cir. 2002); *Tulare County v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002). When doing so, the Court must determine whether the challenged decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this inquiry, the Court "consider[s] whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 415-16. At a minimum, the agency must have weighed the relevant data and articulated an explanation that establishes a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986). In the final analysis, an agency decision is arbitrary and capricious if the agency:

> has relied on factors which Congress has not intended it to consider, entirely failed
> to consider an important aspect of the problem, offered an explanation for its

---

[14]     The parties in this case do not raise any disputed issues of material fact. Pls.' Opp'n at 6, n.3.

decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *see also County of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action.").

## ANALYSIS

As noted previously, plaintiffs challenge the following three decisions made by the NMFS: (1) the July 6, 2004 Final Rule, which allowed 16/0 circle hooks outside the Northeast Distant area without time and area restrictions; (2) the June 1, 2004 BiOp, which concluded that the proposed action will not jeopardize loggerhead sea turtles and that RPAs will avoid jeopardy to leatherback sea turtles; and (3) the June 22, 2004 final SEIS, which plaintiffs allege contain a different analysis of the potential alternatives and their environmental affects than the earlier, draft SEIS.    Plaintiffs' Opposition to Defendants' Motions for Summary Judgment ("Pls.' Opp'n") at 3.    After due consideration of the pleadings and record, the Court, for the following reasons, finds the NMFS's decisions entirely reasonable, supported by the record, and in full compliance with the MSA, ESA, and NEPA.

## I.    Claims Arising Under the Magnuson-Stevens Act

Fisheries of the United States are regulated by the MSA.    The Magnuson-Stevens Act gives the Secretary of Commerce "broad authority to manage and [to] conserve coastal fisheries," to develop the nation's maritime resources in a coherent and

sustainable manner. *Kramer v. Mosbacher*, 878 F.2d 134, 135 (4th Cir. 1989); *see* 16 U.S.C. § 1801(a). Fishery regulations are implemented through Fishery Management Plans ("FMPs"), which are prepared by either a regional fishery council or the NMFS. 16 U.S.C. § 1852(b)(2)(A).[15]

In preparing a FMP, the Magnuson-Stevens Act allows the NMFS to set quotas, to impose gear restrictions, and even to close certain fisheries when doing so is necessary to protect a fishery's long term viability. 18 U.S.C. § 1853(a). This broad discretion is tempered by substantive elements of the Magnuson-Stevens Act that require all regulations to be "necessary and appropriate for the conservation and management of the fishery," and consistent with ten National Standards defined by the statute.[16] 16 U.S.C. § 1851(a)(1)-(10). These National Standards require each FMP to attempt, among other things, to minimize bycatch and adverse economic impact on fishing communities to the

---

[15]     Although the Magnuson-Stevens Act distributes responsibility for preparing FMPs between regional councils and the NMFS, FMPs regulating certain "highly migratory species," including tuna, swordfish, and sharks, are managed directly by the NMFS. 16 U.S.C. § 1852(b)(2)(A). All FMPs, regardless of who prepares them, must be approved by the Secretary of Commerce before taking effect.

[16]     The ten National Standards established in the MSA can be summarized as follows:

> (1) prevent overfishing;
> (2) use the best scientific information available;
> (3) manage fish stocks as a unit throughout their range to the extent practicable;
> (4) do not discriminate between the residents of different states:
> (5) consider efficiency to the extent practicable
> (6) take into account variations among, and contingencies in, fisheries, fishery resources and catches;
> (7) minimize costs and avoid duplication to the extent practicable;
> (8) take into account potential adverse economic impacts of regulations on fishing communities
> (9) minimize bycatch and bycatch mortality to the extent practicable
> (10) promote safety at sea to the extent practicable.

*See* 50 C.F.R. §§ 600.305 – 600.355.

extent practicable.   *See id.*   Accordingly, each FMP must balance competing environmental and economic considerations.  *See id.*

Plaintiffs contend that the July 6, 2004 Final Rule issued by the NMFS modifying the FMP for the Atlantic Fishery violates National Standards 2 and 9 of the Magnuson-Stevens Act because the rule was not based on the "best scientific information available" and failed to minimize bycatch.  Pl.'s Mot. For Summ. Judg. at 9.  I disagree and will address each claim seriatim.

A.     *National Standard 2*

National Standard 2 provides that "conservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  This standard requires that rules issued by the NMFS be based on a thorough review of all the relevant information available at the time the decision was made, *Blue Water Fishermen's Ass'n of Superior Ca. v. Nat. Marine Fisheries Service*, 226 F. Supp. 2d. 330, 338 (D. Mass. 2002); *see also Bennett v. Spear*, 520 U.S. 154, 176 (1998), and insures that the NMFS does not "disregard superior data" in reaching its conclusions, *Building Industry Ass'n v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001).

National Standard 2, however, does not require the NMFS to rely upon perfect or entirely consistent data. *Blue Water Fishermen's Ass'n.*, 226 F. Supp. 2d. at 338; *see also Building Industry Ass'n*, 247 F.3d at 1246 ("[T]he [NMFS must] utilize the best scientific data *available*, not the best scientific data *possible*.") (internal quotations omitted).  The "best information" standard is a practical standard requiring only that fishery regulations

13

be diligently researched and based on sound science.  Moreover, Courts defer to NMFS decisions that are supported in the record and reflect reasoned decision making, especially where, as here, the dispute involves technical issues that implicate substantial agency expertise.  *See Sierra Club v. United States Dep't. of Transp.*, 753 F.2d 120, 129 (D.C. Cir. 1985); *see also Oregon Natural Resources Council*, 490 U.S. at 376-77.

Plaintiffs specifically contend that the NMFS ignored the "undisputed best scientific information available" by failing to adopt the findings from the Northeast Distant experiment in its 2004 Final Rule for the Atlantic Fishery. Pl.'s Mot. for Summ. Judg. at 13, 15.  Because the Northeast Distant experiment concluded that 18/0 circle hooks significantly reduced bycatch of both loggerhead and leatherback sea turtles, plaintiffs contend that National Standard 2, in effect, *required* the NMFS to adopt this rule for the entire fishery.  *Id.* at 13.   Thus, by considering additional sources of information and ultimately adopting a different rule for outside the Northeast Distant experiment, plaintiffs argue that the NMFS's decision is arbitrary and capricious.  *Id.* at 15.  Would that it were that simple!

National Standard 2 neither requires NMFS to rely exclusively on the results from the Northeast Distant experiment in preparing the Final Rule, nor does it require NMFS to adopt the most protective measure throughout the fishery.   While the findings of the Northeast Distant experiment are relevant to the issue of bycatch regulations in the fishery, they are not dispositive.  NMFS was thus entitled to consider, as it did, other studies and expert opinions as part of the rule-making process.  The comprehensive

approach adopted by the NMFS, therefore, was entirely reasonable because it considered not only its own data, but also other studies, expert opinions, and considerations raised by the public at large. *See, e.g.*, AR Vol. 12, Doc. II-A-40; Doc. II-A-54; AR Vol. 8, Doc. II-A-20 (Bolten/Azores 2002 Project Summary); AR Vol. 9, Doc. II-A-23 (Javitech/Nova Scotia 2002 Report). The NMFS's deliberative process, as reflected in the record, clearly evinces the type of diligent research and healthy debate Congress intended by adopting National Standard 2.

Finally, plaintiffs also argue that the NMFS abandoned its own "best information" when it changed its position on gear regulations after the draft SEIS public comment period. However, contrary to the plaintiffs' contention that the NMFS was capitulating to the fishing industry, the Court concludes the NMFS's decision reflects a balanced and rational decision-making process with fully informed public comment. Indeed, the NMFS conducted a vigorous and fair process in which the public was able to inform and influence regulations, as intended, through an open dialog with a wide range of decision makers. Accordingly, the Court concludes the challenged portions of the 2004 Final Rule are consistent with National Standard 2 and that the NMFS's decision was not arbitrary and capricious.

B.    *National Standard 9*

National Standard 9 provides that "conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9). As the statute

expressly states, National Standard 9 only requires the NMFS to minimize bycatch *to the extent practicable. Id.* Where bycatch cannot be eliminated, however, the NMFS must enact regulations that *minimize* the mortality of the undesirable catch. *Id.* Notwithstanding plaintiffs' arguments to the contrary, NMFS did so here.

Plaintiffs first argue that the NMFS violated National Standard 9 by rejecting a gear regulation that promised a greater reduction in sea turtle interactions than the alternative ultimately chosen. Pl.'s Mot. for Summ. Judg. at 11. Based on findings from the Northeast Distant experiment that indicated that the 18/0 circle hooks could dramatically decrease the number of loggerhead sea turtles that were "foul hooked" by longline fishermen, plaintiffs assert that National Standard 9 *requires* the NMFS to adopt the most protective measure available with regards to minimizing bycatch. *Id.* I disagree.

Plaintiffs' argument is flawed in two respects. First, they mistakenly read National Standard 9 in a vacuum, rather than in relation to the other national standards contained in the MSA. All ten of the national standards were promulgated to influence and shape the NMFS rule-making process. When viewed in this context, fishery regulations issued by the NMFS must undoubtedly minimize bycatch, but also promote safety on the high seas (National Standard 10) and minimize the economic impact of regulations on fishing communities (National Standard 8). 16 U.S.C. §§ 1851(a)(1)-(9); *see also* 50 C.F.R. § 600.350(d). Simply stated, National Standard 9 is not entitled to greater weight than any of these other standards. *See Nat'l Coalition for Marine Conservation v. Evans,* 231 F. Supp. 2d 119, 137 (D.D.C. 2002) (noting that because bycatch could only be entirely

avoided by eliminating *all* commercial activity in the fishery, National Standard 9 only made sense within the larger context of the Magnuson-Stevens Act if it was interpreted as requiring the NMFS to find the combination of regulations that would best meet the statute's various objectives).   In this Court's judgment, NMFS's 2004 Final Rule balanced competing interests by reconciling the economic needs of fishermen with the conservation goal of reducing bycatch to the lowest level possible.   In doing so, it thoroughly reviewed the relevant scientific data on bycatch and consulted with participants in the fishery to determine whether the proposed regulations would be effective and practical.

Second, plaintiffs' argument understates that the Atlantic Fishery FMP was amended in the first instance to address bycatch minimization.   Indeed, closure of the NED and the scientific experiment that followed were a direct result of the 2001 BiOp's report of unacceptable levels of bycatch throughout the fishery.   Based on its research, the NMFS concluded that one significant cause of this bycatch was continued use of traditional J-hooks that indiscriminately ensnared protected sea turtles.   Thus, in an effort to deal with these concerns, the 2004 Final Rule prohibited the use of J-hooks throughout the Atlantic Fishery.   Although the NMFS *might* have done more to reduce bycatch, "*more*" is not the standard that NMFS must follow.

Plaintiffs lastly contend the 8% on-board observer level target set by the Final Rule is legally insufficient to meet NMFS's bycatch assessment duties under National Standard 9.  Pl.'s Mot. SJ at 16-17.  I disagree.  National Standard 9 provides that each FMP must

include "a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery." 16 U.S.C. § 1853(a). Notably, the standard does not mandate on-board observer coverage or establish absolute levels of coverage. Furthermore, even if it did, the 8% coverage mandated in this case exceeds the 5% coverage upheld in *National Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 139 (D.D.C 2002) ("*NCMC*"). While *NCMC* is not binding on this Court, its holding and reasoning are persuasive, particularly because that Court relied, in part, on the fact that 5% coverage was the level of coverage recommended by the International Commission for the Conservation of Atlantic Tuna. *Id.* Accordingly, the Court concludes that the NMFS's standardized reporting methodology comports with National Standard 9 and is not arbitrary and capricious under the APA.

## II.     Claims Arising Under the ESA

Prior to engaging in any action that "may affect" a protected species or its habitat, the ESA requires each federal agency to consult with either the Fish and Wildlife Service or the NMFS "to insure that [its] action ... is not likely to jeopardize the continued existence" of the listed species. 16 U.S.C. 1536(a)(2); 50 C.F.R. §§ 402.01(a), 402.14(a). If it is determined that the proposed action is likely to jeopardize the continued existence of any endangered or threatened species, section 7 of the ESA requires the two agencies to enter into a "formal consultation" and to issue a BiOp. 50 C.F.R. § 402.14(h). The BiOp, based on extensive analysis of the best scientific data available, represents a complete and final review of the agency's proposed action.

The BiOp must include a summary of the data supporting the NMFS's conclusions, a "detailed discussion" of the projected effect of the agency action on the listed species, and a determination as to whether the proposed agency action will "jeopardize the continued existence of a listed species." *Id.* If the BiOp concludes that the proposed action *is likely* to jeopardize a protected species, the ESA requires an examination of whether any RPAs exist that are capable of accomplishing the same general purpose as the proposed action, but without compromising the threatened species, and which could be implemented feasibly. *Id.* Alternatively, if the BiOp concludes that the proposed action *is not likely* to jeopardize any protected species, or if an RPA is available that could reasonably avoid that jeopardy, an ITS authorizing the proposed action will be issued and the agency will be permitted to proceed without violating section 9 of the ESA's taking prohibitions. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(I).

Plaintiffs' overarching criticism regarding the 2004 BiOp is that it violates section 7 of the ESA. As discussed *supra*, NMFS concluded in the 2004 BiOp that the fishery would not jeopardize the continued existence of the loggerhead and leatherback sea turtles, provided the fishery was operated in accordance with the conservation rule (requiring the 18/0 circle hooks in the NED and the 16/0 circle hooks elsewhere) and the RPAs. AR Vol. 1, Doc. I-10 at 7-1, 8-1. Although they raise a number of more specific criticisms to support this overarching criticism, the plaintiffs' primary concern is that the NMFS failed to base the 2004 BiOp on the "best scientific and commercial data

available." *See* Pl.'s Mot. For Summ. Judg. at 20-24, 33-38. In essence, plaintiffs' "best scientific and commercial data" argument parallels the argument they similarly raised in relation to National Standard 2 of the MSA. Contrary to plaintiffs' contentions, the Court concludes, for the following reasons, that the 2004 BiOp is fundamentally sound, comports with section 7 of the ESA, and, therefore, is not arbitrary and capricious.

The NMFS considered the "best scientific and commercial data available" in reaching its conclusions in the 2004 BiOp. With respect to the no jeopardy finding concerning the loggerhead sea turtles, the NMFS relied upon an abundance of reliable information, including data demonstrating that: interactions with loggerheads were typically with the juvenile age class rather than breeding females, AR Vol. 1, Doc. I-10 at 6-3 to 6-5; nesting subpopulations were not in decline, *Id.*; and when compared against the J-hook, the 16/0 circle hooks actually improve post-mortem survival rates because the circle hook is generally not swallowed and, therefore, more hooks can be removed without fatality, AR Vol. 13, Doc. II-A-34 at 2 ("Rationale" report for rule making submitted by the scientists for NMFS's Southeast Fisheries Science Center).

With respect to the leatherback sea turtles, the NMFS found the conservation rule *would* cause jeopardy to their continued existence.[17] AR Vol. 1, Doc. 1-10 at 7-1. Given the jeopardy finding, the NMFS included a four-pronged RPA designed to reduce post-release mortality. *Id.* at 8-1. The RPA included:

---

[17]     The jeopardy finding was based on, among other reasons: data that leatherback populations are likely smaller than loggerhead populations; data that population models are less precise; and data that indicated the benefits of 16/0 circle hooks were less certain. AR Vol. 1, Doc. 1-10 at 6-8 to 6-9.

1.    Reducing the post-release mortality of leatherbacks by requiring more effective gear removal;

2.    Increasing on-board observer coverage;

3.    Confirming the environmental and economic feasibility of 16/0 circle hooks; and

4.    Implementing management strategy to prevent long-term elevated take and mortality.

AR Vol. 1, Doc. I-10 at 8-1.    The NMFS anticipated that the RPAs would be implemented incrementally from 2004 to 2007 and that post-release mortality rates would decline each year.  *Id.* at 8-18, and Table 8.2.  The NMFS also anticipated ultimate post-release mortality reductions of leatherback sea turtles from 32.8% to 13.1%.  *Id.* at 8-18.

In reaching these conclusions, the NMFS relied upon the following two premises: (1) that 16/0 circle hooks will reduce leatherback captures by 50%, and (2) that increased gear removal rates will dramatically reduce post-release mortality.  Pl.'s Mot. For Summ. Judg. at 34.  Plaintiffs argue that the RPAs do not achieve a "reasonable certainty of avoiding jeopardy" to the leatherbacks and, therefore, the RPAs violate the ESA.  *Id.* at 33.  I disagree.

The first premise was based upon the analysis of a gear expert, who concluded that 16/0 circle hooks will reduce leatherback captures by 50%.  AR Vol. 1, Doc. I-10 at 4-19.  Indeed, the expert based his conclusion on the data indicating that the 16/0 circle hooks were "just as effective ... if not more so" in reducing leatherback captures by foul hooking as the 18/0 circle hooks, which the Northeast Distant experiment had demonstrated reduced leatherback capture rates between 50% to 90%.  *Id.*  The second premise, that longline fishermen will achieve high levels of gear removal and thus a corresponding

reduction in post-release mortality, was based upon reliable scientific data compiled during the Northeast Distant experiment. AR Vol. 1, Doc. I-10 at 4-25. More precisely, the NMFS compared the experiment circle hook data to the levels of gear removal that occurred outside the NED. *Id.*

Great deference must be given to the NMFS when assessing the sufficiency of the scientific data the agency relied upon to reach its conclusions. *E.g., Bennett*, 520 U.S. at 176 (noting that the best scientific data requirement exists to prevent an agency from implementing the ESA "haphazardly" or "on the basis of speculation or surmise"); *Blue Water Fishermen's Ass'n*, 226 F. Supp. 2d at 339 ("The agency's conclusion need not be airtight and indisputable."). Stated simply, the Court should not "pretend" to have greater expertise than the NMFS in scientific matters concerning sea turtle viability in the fishery. *Bays' Legal Fund v. Browner*, 828 F. Supp. 102, 107 (D. Mass. 1993). Accordingly, the Court concludes that the NMFS's conclusions reasonably follow from the "best scientific and commercial data available," and, therefore, the 2004 BiOp is not arbitrary or capricious.[18]

---

[18]    Plaintiffs have made several additional challenges to the sufficiency of the data relied upon by the NMFS, which this Court finds similarly unpersuasive. The plaintiffs contest the NMFS's failure to use longline sea turtle bycatch data from 2003 in the 2004 BiOp. Pl.'s Mot. For Summ. Judg. at 21-22. However, as the NMFS made clear, "[t]he 2002 data represent[ed] the most complete information *available* (observer data, but not effort data, [was] available for 2003), ...." AR Vol. 1, Doc. 10 at 4-17 (emphasis added). Thus, because the 2003 data was not fully available, the NMFS's decision not to rely on the incomplete 2003 data was not arbitrary or capricious. *See Bldg. Indus. Ass'n*, 247 F.3d at 1246-47 ("[T]he [NMFS must] utilize the best scientific data *available*, not the best scientific data *possible*.") (emphasis in original). The plaintiffs also argue that the NMFS applied an "unduly restrictive definition of 'action area'" and, as a result, failed to consider threats sea turtles encounter on land and beyond the fishery. *See* Pl.'s Mot. For Summ. Judg. at 24-27. Because sea turtles are highly migratory and range from the Atlantic Ocean to the Mediterranean, plaintiffs argue that the NMFS improperly restricted the action area to the U.S. Exclusive Economic Zone, the high seas that are open to U.S. long liners, and to the EEZs of other nations that are open to U.S. fisherman. *Id.* at 24-25. I disagree. The plaintiffs misconstrue the definition of "action area," *see* C.F.R. § 402.02, to include the full migratory range of the sea turtles. *Oceana, Inc. v. Evans*, 2005 WL 1847303, *17-19 (D.D.C. Aug. 2, 2005) ("[T]he regulatory definition of 'action area,' ... focuses on the effects of an action in a geographic 'area,' and not on a species."). Thus, the NMFS in this case considered the appropriate

## III.    Claims Arising under NEPA

The third and final statutory basis upon which plaintiffs rest their challenge is NEPA. *See* Pl.'s Mot. For Summ. Judg. at 40-45.  As the Supreme Court has stated, "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 399 (1989). Because NEPA is procedural rather than substantive, the statutory scheme exists only to insure the agency has made "a fully informed and well-considered decision." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978). Consequently, judicial review, though "searching and careful," is ultimately limited in scope. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Deference is particularly warranted in cases such as this involving complex scientific or technical matters where the agency's expertise is clear. *See Izaak Walton League of America v. Marsh*, 665 F.2d 346, 372 (D.C. Cir. 1981) ("In particular, [courts] should not attempt to resolve conflicting scientific opinions.... So long as the agency's conclusions have a substantial basis in fact, the mandate of NEPA has been satisfied.").   For the following reasons, none of the plaintiffs' NEPA contentions are meritorious.

### A.    *Adequacy of the Public Comment*

Plaintiffs first contend that the NMFS should have issued a supplemental draft SEIS after deciding to propose a general 16/0 circle hook restriction for areas outside the NED. Pl.'s Mot. For Summ. Judg. at 41.  More precisely, plaintiffs argue that the NMFS

---

"action area," *see* AR Vol. 1, Doc. I-10 at 2-16, and otherwise met the statutory and regulatory requirements of section 7 of the ESA.

violated NEPA because the public did not have an adequate opportunity to review and comment on the 16/0 circle hook alternative before the NMFS released the final SEIS and Final Rule. I disagree.

The NMFS issued a draft SEIS in February 2004, analyzing the effectiveness of various combinations of hook size and shape, bait type, and time/area closures in an effort to reduce long line turtle bycatch. A.R. Vol. 1, Doc. I-8, at 4-1 to 4-39. The draft SEIS considered sixteen alternatives, including various circle and/or J-hook options. *Id.* at 2-1 to 2-6. Significantly, one such alternative (i.e., A5) considered a 16/0 circle hook option for areas outside of the NED, *id.* at 4-2, while ultimately noting that the alternative "would not by itself reduce sea turtle interactions in the Atlantic pelagic longline fishery to levels that would allow compliance with the ESA," *id.* at 4-31. After the public comment period on the draft SEIS expired, the NMFS issued the 2004 BiOp and the final SEIS. The final SEIS concluded that, notwithstanding its previous determination to the contrary in the draft SEIS, the 16/0 circle hook option for areas outside the NED was the preferred alternative. Thus, NMFS based its decision upon the relevant scientific information, in addition to comments offered during the public comment period on the draft SEIS. AR Vol. 2, Doc. I-11 at iii and 4-2.

The Court believes NMFS has clearly complied with NEPA's procedural requirements and has made a fully informed decision. The regulation governing draft environmental impact statements was complied with here and more than sufficient to provide "meaningful analysis" and to ensure adequate public comment. 40 C.F.R. §

1502.9(a).[19]   The draft included the 16/0 circle hook as an alternative and, though it was

preliminarily determined not to be effective on its own, NMFS never precluded comment

on the 16/0 circle hook alternative.  *See Kettle Range Conservation Group v. U.S. Forest

Serv.*, 148 F. Supp. 2d 1107, 1119 (E.D. Wash. 2001).  In the final analysis, the regulation

simply does not *require* NMFS to "rework its draft if it later realizes an alternative it

preliminarily rejected should be more fully developed."  *Id.*   Accordingly, the Court

concludes that the final SEIS allowed for adequate public comment and, thus, it does not

violate NEPA.

     *B.*     *Adequacy of the Cumulative Impacts Analysis*

     Finally, plaintiffs contend that NMFS violated NEPA by failing to properly

analyze the cumulative impacts of the Final Rule in its final SEIS.  Pl.'s Mot. For Summ.

Judg. at 43.  Not so, in this case.

     NEPA regulations define "cumulative impacts" as:

> [T]he impact on the environment which results from the incremental impact
> of the action when added to other past, present, and reasonably foreseeable
> future actions regardless of what agency (Federal or non-Federal) or person
> undertakes such other actions. Cumulative impacts can result from
> individually minor but collectively significant actions taking place over a
> period of time.

40 C.F.R. § 1508.7.

     The final SEIS in this case includes a section specifically addressing the

"cumulative ecological, economic and social impacts of past, present, and reasonably

---

[19]      Section 1502.9(a) provides, in relevant part, that an "agency shall prepare and circulate a revised draft" *only* "if a draft statement *is so inadequate as to preclude meaningful analysis*[.]" 40 C.F.R. § 1502.9(a) (emphasis added).

foreseeable future actions" with regard to the fishery.  AR Vol. 2, Doc. I-11, at 4-57 to 4-62 (addressing the "cumulative ecological impacts" and the "cumulative economic and social impacts" of the proposed action).  Among the cumulative impacts considered were: past and future rules governing the conservation of sea turtles and other species in the fishery, *id.* at 4-57; the implementation of VMS requirements for pelagic longline vessels, *id.* at 4-58; and future proposed rules relating to international trade permits, import prohibitions, quotas, and additional bycatch reduction measures, *id.*  Furthermore, the final SEIS also considered the impact of loggerhead and leatherback sea turtle takes by non-U.S. fleets fishing in the Atlantic Ocean, *id.* at 3-37 to 3-38, in addition to takes by foreign longline fleets outside the fishery, *id.* at 4-41.  NMFS concluded these past, present, and future actions would inure to the sea turtles' benefit, as they would help to replenish sea turtle stocks and reduce bycatch and bycatch mortality rates.  *Id.* at 4-60.

Plaintiffs contend that NMFS's analysis is too narrow in scope and that it should have calculated the total number of "takes" in other U.S. and foreign fisheries.  Pl.'s Mot. For Summ. Judgm. at 44-45.  But plaintiffs' interpretation and application of the cumulative impacts misreads or overlooks the "rule of reason." *See, e.g., Potomac Alliance v. U.S. Nuclear Regulatory Comm'n*, 682 F.2d 1030, 1035 (D.C. Cir. 1985) ("The starting point in any analysis of an agency's compliance with ... NEPA is the 'rule of reason,' under which a federal agency proposing a major action must consider only the reasonably foreseeable environmental effects of the action.").  That NMFS *could have* conducted a more comprehensive cumulative impacts analysis does not render its analysis

violative of NEPA. *So. Utah Wilderness Alliance v. Norton*, 326 F. Supp. 2d 102 (D.D.C. 2004). To the contrary, as our Circuit Court has observed, an agency need only consider those environmental effects that are "*reasonably foreseeable.*" *Potomac Alliance*, 682 F.2d at 1035 (emphasis added). Indeed, "NEPA does not mandate that every *conceivable* possibility which someone might dream up must be explored in an EIS." *Concerned About Trident v. Rumsfeld*, 555 F.2d 817, 829 (D.C. Cir.1977) (emphasis added). Thus, having found that NMFS adequately identified the cumulative impacts in the final SEIS, this Court defers to its cumulative impacts analysis, *Hammond v. Norton*, 370 F. Supp. 2d 226, 245 (D.D.C. 2004) (noting the task of identifying the "cumulative impacts" is "committed 'to the special competency' of the agency preparing the EIS") (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 413 (1976)), and concludes that the final SEIS comports with NEPA.

## CONCLUSION

For the reasons stated above, the plaintiffs' motion for summary judgment is DENIED, federal defendant's cross-motion for summary judgment is GRANTED, and intervernor defendant's cross-motion for summary judgment is DENIED as moot. An appropriate order will issue simultaneously herewith.

RICHARD J. LEON
United States District Judge